MICHAEL C. ORMSBY
United States Attorney
Eastern District of Washington
Jared C. Kimball
Assistant United States Attorney
Post Office Box 1494
Spokane, WA 99210-1494
Telephone:  (509) 353-2767

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | 14-CR-21-RMP-25 |
| vs. | United States' Trial Memorandum |
| JASON C. BROWN, | |
| Defendant. | |

Plaintiff, United States of America, by and through Michael C. Ormsby, United States Attorney, for the Eastern District of Washington, and Jared C. Kimball, Assistant United States Attorney for the Eastern District of Washington, respectfully submits the following Trial Memorandum.

## I.    FACTUAL BACKGROUND

### A.    T-III Investigation:

During the summer of 2011, members of the Spokane Violent Crime Gang Enforcement Team (SVCGET) began an investigation targeting area gang members and their associates who were involved in the illegal distribution of controlled substances, to include Oxycodone, methamphetamine, heroin, and Phencyclidine (PCP), and cocaine, and related criminal acts, including firearms violations occurring in the Spokane regional area.  The SVCGET is a multi-agency federally funded FBI "Safe Streets" Task Force which is comprised of police officers,

United States' Trial Memorandum - 1

P50424dd.JKA

agents, detectives, and representatives from the Spokane County Sheriff's Office (SCSO), Spokane Police Department (SPD), Washington State Patrol (WSP), Bureau of Alcohol Tobacco Firearms and Explosives (ATF), U.S. Border Patrol, the Federal Bureau of Investigation (FBI), and the Washington State Department of Corrections (DOC). This investigation, which targeted gang members and their associates, resulted in the successful identification of numerous subjects, comprised of several different sets of the Crips street gangs, who of which were identified to be involved in substantial federal and state law violations.

During the summer of 2011, it became apparent based on other investigations conducted by members of the SVCGET, as well as information received from various sources, that members and associates of the "Rolling 20s Crips", to include Deandre S. Gaither, Stafone N. Fuentes, Sean Allen, Robert Y. L. Rushing, **JASON C. BROWN**, John A. Grace, Jason L. Jones, Sean Lambert, Kenneth Budik and others, were actively involved in the trafficking of controlled substances in the Spokane, Washington area. These individuals have been identified through controlled substances transactions, to included Oxycodone, Phencyclidine (PCP), heroin, MDMA, methamphetamine and cocaine, conducted in the Spokane, Washington area. The SVCGET relied on many investigative techniques to identify targets of the investigation to include; surveillance operations; law enforcement interviews of confidential informants (CI); information gleaned from the issuance of FBI Administrative Subpoenas; and other investigative procedures.

The Rolling 20s Crips are a Long Beach, California, based street gang which has been operating drug enterprise operations in the Spokane Regional area since the 1993-1994 timeframe. The Rolling 20s Crips came to Spokane to distribute crack cocaine because they were able to earn more money by selling crack cocaine in Spokane than they were able to earn on the streets in Long Beach, California. During the last twenty years, they have grown in numbers and have been involved in criminal activity, specifically trafficking in controlled substances to include crack cocaine,

United States' Trial Memorandum - 2

heroin, MDMA, Phencyclidine (PCP) and Oxycodone. The Rolling 20s Crips are also implicated directly and/or indirectly in violent assaults and homicides relating to gang and narcotics trafficking activities occurring both in the Spokane area, California and Nevada.

The SVCGET and other law enforcement units were able to develop several Confidential Informants (CI) in this case who were in a position to provide direct and probative access to area gang members and associates criminal activities which were identified to be occurring in the Spokane regional area. Several of these CIs were in a position to engage in controlled drug buy scenarios from gang members and associates at the direction and management of the SVCGET or related law enforcement unit(s). Those CIs that were utilized during controlled drug buy scenarios participated in consensual audio and/or video recordings to gather evidence.

The CIs and the overall investigation revealed that the Rollin 20's Crips were associating freely and conspiring with Spokane gang members from other Crip "sets" *i.e.,* other gang entities based on Spokane. The Defendant at issue here, **JASON C. BROWN**, is a self-declared Rollin' 60's Crip. The investigation revealed that these gang members (those originally from Los Angeles/Long Beach, CA and/or Las Vegas, NV) were actively working with local Spokane-based gang members to acquire and distribute narcotics – with their efforts focused on distributing Oxycodone pills.

On July 18, 2012, CI#2 provided information to members of the SVCGET regarding the trafficking of controlled substances by Deandre Gaither and his associates. CI#2 learned that Gaither (a Rolling 20's Crip gang member) controlled most of the pills being delivered in the Spokane area. CI#2 reported Gaither was receiving thousands of pills at a time and selling them for a profit throughout Spokane.

The investigation also revealed that Oxycodone pills (destined for Gaither and his associated) were also arriving in Spokane from sources of supply located in Las Vegas, NV. The case investigation confirmed that Gaither relied heavily on a Las

United States' Trial Memorandum - 3

P50424dd.JKA

Vegas source of supply referred to as "BG" for Oxycodone pills.  The investigation continued to define the connection between Gaither, "BG" and **JASON C. BROWN**.

On September 30, 2013, a CI learned that Deandre Gaither was fronted 700 Oxycodone pills from a supplier from Las Vegas, Nevada who goes by the moniker "BG" and is an associate of Keith Williams, aka "Vegas."  ("BG" is later identified as Kory Hall.)  Gaither paid $22.00 per pill and was selling the pills for $30.00 a pill.  CI#3 also reported that Sean Lambert, aka "Jon B" has several firearms.

On October 21, 2013, the United States District Court for the Eastern District of Washington issued an Order authorizing the interception of wire and electronic communications occurring to and from (509) 701-6242 ("Target Telephone 1"), utilized by DEANDRE GAITHER (a/k/a "Trouble"), for thirty (30) days. *See MJ 13-0402-00 (Target Telephone 1)*. Interception by the FBI-SRO commenced on October 22, 2013, and was terminated on November 20, 2013. *See MJ 13-0402-00 (Target Telephone 1)*.

On October 26, 2013, at approximately 7:43 p.m., FBI intercepted an incoming telephone call (Session 883) to TT1, used by Deandre Gaither from telephone number (509) 944-6721, used by Robert Rushing.  Robert Rushing tells Gaither "*the shit won't be here til Monday*" because they put it in the mail.

On October 27, 2013, at approximately 1:55 p.m., FBI intercepted an outgoing telephone call (Session 996) from TT1, believed to be used by Deandre Gaither to telephone number **(509) 714-7861**, used by **JASON C. BROWN**.  Deandre Gaither calls **JASON C. BROWN** and asked if "*you got beans on you*."  Gaither said "*I'm comin around the corner on Thor, you know, I'm about to pull over there*."  Gaither is on Thor Street which is a block away from Ferrell Street, where **JASON C. BROWN** resides (411 S. Ferrell).[1]

---

[1] The United States understands that the Defendant was intercepted on thirty-five (35) calls in this T-III case. For purposes of this Trial Memorandum, only select calls will

P50424dd.JKA

On October 29, 2013, physical surveillance was conducted at Inland Empire Auto Sales located at 3101 N. Division where **JASON C. BROWN** was observed at his place of employment.  **JASON C. BROWN** was observed on his cellular telephone and after several minutes Aaron Brown, **JASON C. BROWN'S** cousin arrived in the area driving a blue Mercury Marquis, Washington license, 751ZVT.  Aaron Brown began to aggressively follow one of the investigators (Det. Brad Richmond) who was conducting surveillance.  This investigator had to make numerous evasive driving techniques in order to get away from Aaron Brown in traffic.

On October 30, 2013, surveillance was conducted in the area PM Auto Sales, 3131 E. Sprague, Spokane, Washington where Deandre Gaither was observed meeting with **JASON C. BROWN**.  **JASON C. BROWN** was observed driving a blue Mercury Marquis, Washington license 751ZVT.

On October 31, 2013, at approximately 11:24 a.m., FBI intercepted an incoming telephone call (Session 1581) to TT1, used by Deandre Gaither, from telephone number **(509) 714-7861**, used by **JASON C. BROWN**.  Gaither tells **JASON C. BROWN**  -  "*Look I know it cuz I know he be hustlin and I know cuz a bitch just told me that niggas wanted that motherfuckin water out there, I got like 20 zips of this shit you know what I'm sayin, so tell Lamont if you can find out, even if, shit your cousin's out there, your female cousin, I'll give em a blow out deal, 250, 225 a zip and I'll look out for you, I just wanna get rid of this shit... I got 20 ounces nigga do the math... 25, 225 and 25 whats that? Boom, that's what I'm sayin....* **JASON C. BROWN** says "*yeah, uh*."

On October 31, 2013, law enforcement contacted FedEx Operations and provided FedEx with a package tracking number, 7970 5057 7630, as derived from the text message (Session 1601) which UM1471 sent to Deandre Gaither. FedEx was

be referenced in the interest of brevity. At trial, potentially all thirty-five (35) T-III intercepted calls may be introduced in evidence and played for the jury.

P50424dd.JKA

instructed to intercept the package as containing suspected contraband.  On November 1, 2013, FedEx Operations intercepted the package at the FedEx Distribution Center, 515 N. Havana, Spokane, Washington, 99202.  On the same day, the FedEx package was provided to law enforcement and was secured as evidence and sealed pending application for a search warrant.

On November 8, 2013, a federal search warrant was executed on the FedEx package seized on November 1, 2013 as referenced in the above paragraphs.  The search revealed 118 pills with the markings "A/215" and 120 pills with the markings "M30."

On November 1, 2013, from approximately 9:16 p.m. through 11:58 p.m., physical surveillance was conducted at a restaurant/bar (Goodtymes) in the Spokane Valley, Washington.  A gold Tahoe, Washington license 811YLL (used by Stafone Fuentes), a black Cadillac Escalade, Idaho license K441429 (used by **JASON C. BROWN**), a tan BMW X5, Washington license, 098XAY (used by Kenneth Budik), and a blue Mercury Marquis, Washington license 751ZVT (used by Aaron Brown and **JASON C. BROWN**) were observed in the parking lot of the restaurant/bar.  Fuentes was observed in the parking lot conducting what appeared to be controlled substance transactions due to the length and location of the meeting time.  Aaron Brown was observed driving the Marquis and following **JASON C. BROWN** in the Cadillac Escalade departing the parking lot.  Title III intercepts corroborated that **JASON C. BROWN** and Gaither were meeting at the restaurant bar (Session 1995 and Session 2011).  This meeting was for the co-conspirators to meet "BG"- Kory Hall who had arrived from Las Vegas with a supply of Oxycodone pills for distribution amongst co-conspirators.

At 10:00 p.m. on that same day (Nov. 1, 2013) , (Call Session 2000), **JASON C. BROWN** utilizing **(509) 714-7861** calls Gaither on **TT1** and asked if it "*was packed?*"  Gaither said he "*has some work with him and a female with him.*"  Gaither

P50424dd.JKA

was advising **JASON C. BROWN** that Gaither he was bringing controlled substances so they can sell them at the restaurant/bar.

At 11:24 p.m. on November 1, 2013, a call placed on phone (702) 742-3710, subscribed to by Anthony Joseph, later identified as being utilized Kory A.J. Hall, was intercepted (Session 2016) on **TT1.**  The call was between Hall and Gaither where Gaither advises he is at the restaurant/bar (Goodtymes) and that Hall would meet Gaither.  At 11:42 p.m., (Session 2018) the user of telephone number (702) 788-2919, subscribed to by Lawn Johnson, later identified as a second telephone utilized by Kory A.J. Hall, contacts Gaither on **TT1** to advise Gaither that Hall is at the door of the restaurant/bar where Gaither is located.  Physical surveillance of the parking lot revealed an unidentified individual arrive during the Title III intercept in a Chevrolet rental car, California license 7AFJ809, which was Hall arriving to meet Gaither and other co-conspirators.

On November 2, 2013, and on the days that follow, Deandre Gaither goes about selling the Oxycodone pills that he acquired from Kory Hall.  The T-III intercepted several calls amongst co-conspirators where pills are discussed (both supply, quantity, and price) and then deals are conducted.

On November 2, 2013, at approximately 9:04 p.m., FBI intercepted an outgoing telephone call (Session 2273) from **TT1**, used by Deandre Gaither (a/k/a Trouble), to **(509) 714-7861**, used by **JASON C. BROWN**.  Gaither was telling **JASON C. BROWN** that Gaither will be going to Nine Mile for a "*fade*" or to conduct a drug transaction which will garner him $1,400.

On November 2, 2013, Gaither and **JASON C. BROWN** exchange phone calls and **JASON C. BROWN** specifically asks Gaither for **182** pills at $22.00 per pill. The call transcript reads as follows:

Call # 2067

**Brown**,       What up (unintelligible)

Gaither,       What up (unintelligible)

1  **Brown**,       Shit man, I'm just headed home.

2  Gaither,       You just left?

3  **Brown**,       Yeah (unintelligible)

4  Gaither,       Uh, sounds good

5  **Brown**,       Hey uhm, you know I was just gettin ready to call you, text you, hey

6               uhm, our boy, our boy is he

7               home?

8  Gaither,       Is who?

9  **Brown**,       You know, he came, came to the club last night.

10 Gaither,       Oh yeah

11 [Talking over each other, unintelligible conversation]

12 Gaither,       I'll come to you and give it [talking over each other]

13 **Brown**,       I know but I can't, I can't do that around the job (unintelligible) I can't do

14              that for a minute.

15 Gaither,       Well I got em, I got em, I got em anyways, so...

16 **Brown**,       Ah, you do?

17 Gaither,       Yeah.,

18 **Brown**,       What you gonna be able to give them to me for?

19 Gaither,       Loc, cus I have to give him still the same shit, 22

20 **Brown**,       Uhh, alright

21 Gaither,       Cus I gotta give him, I gotta give him 22 period, you feel me?

22 **Brown**,       Yeah.

23 Gaither,       So whatever I'll make yours, whatever, you know what I'm sayin?

24 **Brown**,       Yeah, yeah, yeah, yeah, yeah, but naw, I was I mean you already know c

25         ousin I'm not tryin to

26 (unintelligible)

27 Gaither,       No, uh, yeah, yeah, I know, I already know, I aint trippin, I give them to

28              you for 22, that's what I

United States' Trial Memorandum - 8

P50424dd.JKA

1    said, I aint trippin

2    **Brown**,    Yeah but the rest

3    [Talking over each other]

4    Gaither,    No Pookie.

5    **Brown**,    Huh?

6    Gaither,    I'm talkin to my daughter, she bringin

7    [unable to determine conversation at this point, unable to determine if Gaither is

8    speaking to Brown or his

9    daughter]

10    Gaither,    How many, how many do you want, oh yeah that's 128?

11    **Brown**,    No 182.

12    Gaither,    Yeah sure, you got it....you got it....I got cha. Hey man look when is your

13    lunch break or stuff or

14    what?

15    **Brown**,    Oh, I can take a lunch break whenever, I just can't go, you know what I'm

16    sayin, I just can't leave

17    outta

18    Gaither,    Yeah, yeah, yeah, yeah, yeah, yeah ok (unintelligible)

19    **Brown**,    When you come to town, whenever you come to town (unintelligible)

20    Gaither,    Alright buddy

21    **Brown**,    What's happenin though?

22    Gaither,    Shit, shit I just woke up, I gotta, shit I'm about to go get a rental car for

23    the weekend

24    (unintelligible) I gotta get this money (unintelligable) six thousand

25    (unintelligible)

26    **Brown**,    (unintelligible)

27    Gaither,    (unintelligible) it won't happen no more, that's why nigga aint gonna be

28    going out like that (unintelligible) fuck that shit

United States' Trial Memorandum - 9

P50424dd.JKA

| | |
|---|---|
| **Brown**, | (unintelligible) |
| Gaither, | Yeah, fuck that, we cool |
| **Brown**, | Ah, yeah, I still (unintelligible) |
| Gaither, | Oh, uh uh (unintelligible). |
| Gaither, | Yeah |
| **Brown**, | Yeah, whenever you come to town, just get with me, I'll have the bread with me and I'll just pull away from here real quick |
| Gaither, | Alright, I got you. |
| **Brown**, | Alright, cool |
| Gaither, | Alright |

Call ends.

On November 4, 2013, at approximately 12:33 p.m., FBI intercepted an outgoing telephone call (Session 2539) from **TT1**, used by Deandre Gaither (a/k/a Trouble), to (509) 294-8482, used by Jason Jones.  During Session 2539, Jones attempted to get his money and/or illegal drug supply counted and in order.  Jones was trying to get either 280 Oxycodone pills from people "*down there*" or in California.  Specifically, Jones planned to call "*Coach*," an illegal drug supplier of Jones and Gaither.

On November 4, 2013, at approximately 10:15 a.m., FBI intercepted an incoming telephone call (Session 2498) to **TT1,** used by Deandre Gaither from telephone number (702) 788-2919, used by Kory Hall. During Session 2498, Hall called Gaither to discuss the sale of the Oxycodone pills Hall delivered to Gaither.  Hall discusses an individual who is selling a "*fade*" of "*twenties and fifties*," meaning smaller quantities of the Oxycodone pills for him.   Hall further informs Gaither he is a "*boss man*" and Gaither is "*loaded down*," meaning Hall supplied Gaither with plenty of Oxycodone pills.  Gaither tells Hall he will probably be sending Hall "*twenty-two*" or twenty-two hundred dollars for payment for the Oxycodone pills.  Hall responds by telling Gaither to "*let me get you information*," meaning the bank account information so Gaither can "*put it in real fast*" or deposit the money.  This call further illustrates the connection

United States' Trial Memorandum - 10

between Hall, Gaither, and other co-conspirators who reap the benefits (a supply of Oxy pills) when Hall is in Spokane.

On November 5, 201, at 8:56 p.m., FBI intercepted an incoming call (Session 2796) between Gaither and (702) 788-2919, used by Kory Hall, aka "BG," which revealed Hall asking Gaither to meet him at the gas station at Sprague and University. At 9:14 p.m., FBI intercepted an outgoing call (Session 2799) between Gaither and (702) 788-2919, used by Kory Hall, aka "BG," which revealed Gaither telling Hall he will be right there and Hall tells Gaither he has "*100 of them*."  At approximately 9:20 p.m. Gaither is observed stopping at a gas station at Sprague and University to make a controlled substance transaction with a black male driving a black Volkswagen.

On November 13, 2013, at approximately 4:59 p.m., FBI intercepted an incoming telephone call (Session 3976) to **TT1**, used by Deandre Gaither from telephone number (702) 742-3710, subscribed to by Anthony Joseph, and used by an Kory Anthony Joseph HALL.  During Session 3976, Hall called Gaither to determine when Hall should come to Spokane from Las Vegas, Nevada and deliver illegal drugs to Gaither.  Gaither reveals that Hall is charging Gaither $22.00 per pill and Gaither turns around and sells them for $25.00 per pill.  Hall tells Gaither there is "*too much talk already over the telephone*" meaning they should not discuss the prices and amounts of illegal drugs over a telephone where it could be intercepted by law enforcement.  Hall would prefer to set up a regularly scheduled delivery so Hall can plan better.  Hall is "*fat as a mother*" meaning he is very successful at what he does. Hall does not want to over supply Gaither as the supply would not move when Hall could sell it himself.  Gaither claims he sells the most illegal drugs for Hall by saying "*who did the majority out the fifteen hundred, me right*?"  Hall tells Gaither he will not "*put all his eggs in one basket*" by just supplying Gaither and that he has people selling for him in other states.  Gaither and Hall further discuss a vehicle which Gaither sold to Hall in exchange for Oxycodone pills.  Gaither paid for the vehicle to be towed to Las Vegas, Nevada where Hall is located.

United States' Trial Memorandum - 11

On November 16, 2013, at approximately 1:20 p.m., FBI intercepted an incoming telephone call (<u>Session 4469</u>) to **TT1**, used by Deandre Gaither, from telephone number **(509) 714-7861,** used by **JASON C. BROWN**.  Gaither asks **JASON C. BROWN** if he is ready and how many he "*is trying to get*?  **JASON C. BROWN** tells Gaither that he wants to get the "*228 for the 5*" (228 pills for $5000). Gaither says it has to add up from $22 "*per thing*."  **JASON C. BROWN** tells Gaither "*that's what it is*."  Gaither says "*How many you want*."  **JASON C. BROWN** replies "*228. 228 for the 5*." Gaither replies, "*All right I'm going to tell him right now*." Gaither is assisting his co-conspirator **JASON C. BROWN** in acquiring Oxycodone pills from Hall for Brown to sell to **JASON C. BROWN**, which he will then sell further to others.

On November 16, 2013, at approximately 1:46 p.m., FBI intercepted an incoming telephone call (<u>Session 4486</u>) to **TT1**, used by Deandre Gaither, from telephone number **(509) 714-7861**, used by **JASON C. BROWN**.  In Session 4486, Deandre Gaither tells **JASON C. BROWN** that he just left his brother's house. **JASON C. BROWN** asks Gaither if his people will agree to 300 (pills) for $5,500.  Gaither tells **JASON C. BROWN** that they want $22 per pill, otherwise they won't give (Brown) any "*beans*" (pills).  **JASON C. BROWN** asks if Gaither can tell them that **JASON C. BROWN** will owe them 120, and Gaither states that they won't do that either. **JASON C. BROWN** tells Gaither that someone tried to line him up with Gaither's boy "*O-Dog*," but he did not want to do that.  **JASON C. BROWN** asks if his price is still 300 pills at $25 apiece.  Gaither advises that "*O-Dog*" is not budging from that price and that Gaither already committed to buying these pills (for **JASON C. BROWN**).

On November 16, 2013 at approximately 12:39 p.m. physical surveillance observed Kory Hall arrived at the Spokane Airport.  Hall was observed being picked by an unknown white male and driven to the Motel 6, 1919 N. Hutchinson, Spokane Valley, Washington.  FBI intercepted (Session 4540) text messages between Kory

United States' Trial Memorandum - 12

P50424dd.JKA

Hall (702-742-3710) and Deandre Gaither (TT1) between 3:12 p.m. and 3:13 p.m. where Gaither advised Hall "*I'm here*" to indicate he was at Hall's location to pick him up.  At approximately 3:18 p.m. surveillance observed Gaither arriving at the Motel 6 and pick up a black male.  FBI intercepted text messages (Session 4421, 4441, 4442, 4443, 4460, 4463, 4464, 4465, 4471, 4472, 4473, 4475, 4478, 4638, 4639) between Kory Hall (702-788-2919) and Deandre Gaither between 10:21 a.m. and 11:31 p.m., which revealed Hall advising Gaither of his travel status from California to the Spokane Airport.  Hall advised Gaither when he was at "*the room*" to indicate the Motel 6.  Gaither advised Hall via text "***Jason** wants 228 he 5000*" and Hall asks "*How many u want*."  Gaither tells Hall "*300 is cool right now*.

In this call, the nature of the conspiracy is well defined.  Hall arrives by plane with pills.  Hall and Gaither then meet in person and exchange phone calls, and Gaither tells Hall that "Jason" – **JASON C. BROWN**), wants "**228**" Oxy pills for $5,000.

On November 16, 2013, at approximately 3:30 p.m. FBI intercepted an incoming telephone call (Session 4547) to **TT1**, used by Deandre Gaither, from telephone number **(509) 714-7861**, used by **JASON C. BROWN**.  Gaither and **JASON C. BROWN** coordinate a meeting place for **JASON C. BROWN**, Hall and Gaither.  At approximately 3:39 p.m., physical surveillance observed Gaither's vehicle with two black males inside meeting with **JASON C. BROWN** at a business near Inland Empire Auto Sales. **JASON C. BROWN** was observed entering Gaither's vehicle. At 3:30 p.m. Elizabeth Weister calls Gaither and Gaither tells her "BG" says "what is happening" and a male voice says hello confirming Kory Hall, aka BG is in the vehicle.

On November 17, 2013, between 2:57 p.m. through 7:51 p.m., (Session 4701, 4715, 4716, 4717, 4718, 4719, 4720, 4721), FBI intercepted text messages between **TT1**, used by Deandre Gaither and (509) 202-5770, used by Sean Lambert.  Gaither and Lambert text about "*blues*," referring to Oxycodone pills and Lambert needing

United States' Trial Memorandum - 13

Gaither to front 50 Oxycodone pills for $25 per pill until Tuesday.  Gaither will not front them as he is getting a price of $28-$30 "*all day for mine*".  Gaither wants cash now for them. This illustrates that following Hall's arrival, Gaither is both well supplied by Hall, and is busy selling pills to co-conspirators (including Sean Lambert).

On November 25, 2013, the United States District Court for the Eastern District of Washington issued an Order authorizing the interception of wire communications occurring to and from (509) 294-8482 ("Target Telephone 2"), utilized by JASON JONES (a/k/a "Loc"), for thirty (30) days. *See MJ 13-0440-00 (Target Telephone 2)*. Interception by the FBI-SRO commenced on November 26, 2013, and was terminated on December 23, 2013. *See MJ 13-0440-00, (Target Telephone 2)*.

On December 13, 2013, CI#4 conducted a controlled purchase of **50** Oxycodone pills for $1,450 in pre-recorded U.S. Currency from **JASON C. BROWN**.  Prior to this controlled purchase, CI#4 contacted **JASON C. BROWN** at telephone number **(509) 714-7861**, a cellular telephone subscribed to by Tiante Tschache, and used by Jason C. Brown.  CI#4 advised **JASON C. BROWN** he/she would meet him at a nearby business location.  CI#4 was observed walking into the alleyway behind the local business.  **JASON C. BROWN** was observed leaving the back door of the residence of Aaron Brown, 411 S Ferrall, Spokane, Washington and walked down the alleyway towards the local business where CI#4 was waiting.  A blue Mercury Marquis, Washington license 751ZVT, driven by Aaron Brown, arrived later and picked up **JASON C. BROWN** and CI#4.  A debrief of CI#4 revealed CI#4 received Oxycodone pills in exchange for U.S. currency occurred inside the vehicle with **JASON C. BROWN** in the passenger seat and Aaron Brown driving.  For a short time, the Mercury Marquis stayed in the area conducting counter surveillance with two individuals inside the vehicle.  A short time later, as CI#4 was awaiting a ride from law enforcement, **JASON C. BROWN** returned in the maroon Jeep Cherokee and appeared to be conducting counter surveillance. Aaron Brown also

P50424dd.JKA

returned in the area in the blue Mercury Marquis and appeared to be conducting counter surveillance. Prior to the controlled purchase, physical surveillance revealed a blue Mercury Marquis, Washington license 751AVT and a maroon Jeep Cherokee, Washington license ALA4402, parked at the residence of Aaron Brown.

On December 18, 2013, at approximately 1:42 p.m., FBI- intercepted an outgoing telephone call (Session 2036) from TT2, used by Jason Jones, to telephone number (509) 217-2547, used by Ronald Gardner. During Session 2036, Jones and Gardner are discussing the selected method of bringing illegal drugs from California to Spokane, Washington. Jones is nervous the drugs will be discovered and asks Gardner if the individual moving the drugs is going to "*tuck it*" (hide in the anus) or instead hide it in his undergarment area. Jones is just checking in with Gardner to make sure he has all his bases covered or if "*you thinkin bout everything?*" Gardner responds that he has been "*doin this just as long*" as Jones.

On November 18, 2013, **JASON C. BROWN** exchanged two (2) phone calls with Jason Jones – this is the day before the arrival of the 370 pills via courier destined for Jones for distribution to others.

On December 19, 2013, at approximately 2:30 p.m. Vonderick M. Noble was selected for secondary screening at the Spokane International Airport by members of the SVCGET after arriving on an Alaska Airlines flight from Long Beach, California. Noble was not made aware of the current wire interceptions but was selected for screening and advised that investigators had probable cause to search his person. Noble provided consent for search of his person where 370 Oxycodone pills were discovered secreted in Noble's undergarment area. The pills were seized as evidence and Noble was released after obtaining Noble's relevant contact information.

On December 19, 2013, at approximately 3:13 p.m., FBI intercepted an incoming telephone (Session 2132) to TT2, used by Jason Jones from (509) 714-8399, used by Vonderick Noble. Jones and Noble discuss Noble being stopped by police at the Spokane Airport and how they "*took it*" or the Oxycodone from him. Noble tells Jones

United States' Trial Memorandum - 15

P50424dd.JKA

he had it secreted under his genitals and Jones tells Noble he was supposed to insert the quantity of pills in his rectum.

On January 24, 2014, the United States District Court for the Eastern District of Washington issued an Order authorizing the interception of wire and electronic communications occurring to and from (509) 879-9797 ("Target Telephone 1(b)"), utilized by DEANDRE GAITHER (a/k/a "Trouble"), for thirty (30) days. *See MJ 14-10002-00, (Target Telephone 1(b))*. Interception by the FBI-SRO commenced on January 27, 2014, and was extended once. *See 14-MJ-10007, (Target Telephone 1(b))(Extension)*.

On January 29, 2014, at approximately 7:55 p.m., FBI intercepted an incoming telephone call (Session 54) to TT1(b) used by DEANDRE GAITHER (a/k/a Trouble), from telephone number **(509) 714-7861**, used by **JASON C. BROWN** (a/k/a Sway, Swag).  During Session 54, Deandre Gaither and **JASON C. BROWN** were discussing **JASON C. BROWN** having a supply of **160** pills.  Gaither also indicates he should have his own supply by Friday or Saturday, specifically "30s" or 30mg Oxycodone pills.

On February 19, 2014, physical surveillance conducted at 411 S Ferrall, Spokane, Washington revealed a Plymouth Breeze, Washington license 841WKF, and a blue Mercury Marquis parked in front of the residence.  A registration check of 841WKF revealed the vehicle has been sold on December 13, 2013 and listed registrant as Steven Block.  A report of sale check revealed the vehicle was sold to **JASON C. BROWN** for $600.00 with a purchaser address of 411 S Ferrall, Spokane, Washington.  Surveillance of 411 S. Ferrall, Spokane, Washington observed Aaron C. Brown exit the residence, enter the Marquis, and then drive away.

On February 19, 2014, *thirty-nine (39) subjects* were federally indicted in the Eastern District of Washington as a result of this investigation.  A federal Criminal Complaint and Arrest Warrants were issued for the arrest of Deandre S. Gaither, Sean M. Allen, Todd Andry, Delmont Black, Aaron C. Brown, **JASON C. BROWN**,

P50424dd.JKA

Kenneth R. Budik, Tony Bramlett, Dyon Bramlett, Eric Burton, Rashjel G. Cage, Jerrelyn Comstock, Gilbert Crawley, Amanda Curry, Joseph L. Davis, Stafone Fuentes, Ronald Gardner, Takiyah Gayle, John Grace, Shauna Gunning, Kory A. J. Hall, Skyler Hansen, Jason L. Jones, Tera Kinard, Michael King, Sean L. Lambert, Kathryn Lust-Liggins, Brett A. Luton, Calvin Mason, Robert Y.L. Rushing, Ronnie Simms, Courtney Vaughn, Sam Ward, Elizabeth Weister, Cierra C. White, Keith Williams, David Womack and Vonderick Noble, based on the aforementioned information.

On February 27, 2014, physical surveillance continued at 411 S. Ferrall, Spokane, Washington.  Aaron Brown was observed exiting the residence wearing a black sweater and black beanie.  Aaron was walking on foot using a telephone to communicate with someone.  After a few moments a silver Chevy Malibu, Washington license AIZ44411, driven by **JASON C. BROWN** pulled up next to Aaron who got inside the front passenger seat of the vehicle**.  JASON C. BROWN** and Aaron were followed to Goodtymes Bar and Grill where **JASON C. BROWN** exited the vehicle and Aaron entered the driver's seat and drove off. **JASON C. BROWN**  entered Goodtymes. **JASON C. BROWN** later exited Goodtymes and was observed again driving the silver Chevy Malibu with Aaron in the passenger seat.  At this point uniformed officers stopped the vehicle as **JASON C. BROWN** had an active Washington State Department of Corrections arrest warrant.  **JASON C. BROWN** was taken into custody and Aaron was left with the vehicle.  During his arrest **JASON C. BROWN** was found with $4,368.00 in U.S. currency on his person.

Target Telephone 1(b) was terminated on March 13, 2014, due to DEANDRE GAITHER (a/k/a "Trouble") being arrested in the Eastern District of Washington. *See 14-MJ-10007, (Target Telephone 1(b)).*

The investigation utilized Pen Register/Trap and Trace devices as authorized by the court to obtain phone activity (non-content) relating to targets of the investigation.

P50424dd.JKA

Regarding Target Telephone 1, phone tolls revealed substantial communication between Deandre S. Gaither and co-conspirator **JASON C. BROWN.**

## II.    CHARGES – BY INDICTMENT

A.    14-CR-21-RMP-25:

Count 2 of the Indictment charges the Defendant with Conspiracy to Distribute Oxycodone Hydrochloride, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C), and 21 U.S.C. § 846.

Count 18 of the Indictment charges the Defendant with one count of Distribution of Oxycodone Hydrochloride, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C).

B.    Elements of the Offenses:

The United States submits that in order to convict the Defendant of Conspiracy to Distribute Oxycodone, in violation of 21 U.S.C. § 841(a)(1),(b)(1)(C), and 21 U.S.C. § 846 as charged in Count 2 of the Indictment, 14-CR-21-RMP-25, the United States would have to prove the following elements beyond a reasonable doubt:

> *First*, beginning on or about July 18, 2012, and ending on or about February 19, 2014, in the Eastern District of Washington, there was an agreement between two or more persons to distribute Oxycodone Hydrochloride; and,
>
> *Second*, the Defendant, **JASON C. BROWN**, joined in the agreement knowing of its purpose and intending to help accomplish that purpose.

The United States and the Defendant agree that, in order to convict the Defendant of Distribution of Oxycodone, in violation of 21 U.S.C. § 841(a)(1),(b)(1)(C), and as charged in Count 18 of the Indictment, 14-CR-21-RMP-1, the United States would have to prove the following elements beyond a reasonable doubt:

United States' Trial Memorandum - 18

P50424dd.JKA

*First*, on or about June 25, 2013, in the Eastern District of Washington, **JASON C. BROWN**, did knowingly and intentionally distribute a mixture or substance containing a detectable amount of oxycodone hydrochloride, a Schedule II controlled substance; and,

*Second*, **JASON C. BROWN** knew that it was a mixture or substance containing a detectable amount of oxycodone hydrochloride, or some other prohibited drug.

## III.    CONSPIRACY TO DISTRIBUTE OXYCODONE

A.    Single Conspiracy vs. Multiple Conspiracies:

The Government intends to produce evidence at trial which will establish a single overall conspiracy rather than multiple conspiracies. To the extent that the Defendant seeks to argue at trial that he was conspiring with some persons, but not others, the United States proffers the following legal authority regarding conspiracies.

The question of whether there is sufficient evidence to establish a single or multiple conspiracy is a question for the jury, *United States v. Bauer*, 84 F.3d 1549 (9th Cir.), *cert. denied* 519 U.S. 1131 (1997), but the determination of whether to submit the matter to the jury in the first instance and for the determination of severance and dismissal motions, is one for the trial judge. *See United States v. Otis*, 127 F.3d 829, 836 (9th Cir. 1997). The Ninth Circuit has consistently held that the refusal to give a multiple conspiracy instruction is not error. *See, e.g., United States v. Si*, 343 F.3d 1116, 1127 (9th Cir. 2003) (holding no error in not giving multiple conspiracy instruction where instruction given read, "If you find that the conspiracy charged did not exist, then you must return a not guilty verdict even though you may find that some other conspiracy existed"); *United States v. Loya*, 807 F.2d 1483, 1492-93 (9th Cir. 1987) (same); *United States v. Kearney*, 560 F.2d 1358, 1362 (9th Cir.), *cert. denied*, 434 U.S. 971 (1977); *United States v. Perry*, 550 F.2d at 533.

P50424dd.JKA

The question of whether the evidence establishes multiple conspiracies or a single conspiracy is a recurring one which is essentially a question of the sufficiency of the evidence. *United States v. Duran*, 189 F.3d 1071, 1078 (9th Cir. 1999). Simply because segments of the evidence reveal "separate acts at separate times" does not mean there are separate conspiracies. *Id*. Rather, the test, as has been repeatedly enunciated in the Ninth Circuit, is "whether there was one overall agreement to perform various functions to achieve the objectives of the conspiracy." *United States v. Zemek*, 634 F.2d 1159, 1167 (9th Cir. 1980), *cert. denied*, 452 U.S. 905 (1981) (emphasis added); *accord United States v. Patterson*, 819 F.2d 1495, 1502 (9th Cir. 1987); *Bibbero*, 749 F.2d at 587.

The evidence is sufficient to connect a defendant to a conspiracy if it shows that the defendant had knowledge of and participated in the conspiracy. *Duran*, 189 F.3d at 1078; *United States v. Clevenger*, 733 F.2d 1356, 1358 (9th Cir. 1984). A single conspiracy may involve several sub agreements or subgroups of conspirators. *United States v. Frega*, 179 F.3d 793, 819 (9th Cir. 1999); *United States v. Bauer*, 84 F.3d 1549, 1560 (9th Cir. 1996). A formal agreement is not necessary, but agreement may be inferred from the defendants' acts pursuant to the scheme or other circumstantial evidence. *Frega*, 179 F.3d at 819. A single act may be sufficient for drawing an individual defendant into a conspiracy. *United States v. Maseratti*, 1 F.3d 330, 338 (5th Cir. 1993); *United States v. Sasson*, 62 F.3d 874, 887 (7th Cir. 1995); *United States v. Davidson*, 195 F.3d 402, 406 (8th Cir. 1999); *United States v. Rosen*, 764 F.2d 763, 765 (11th Cir. 1985), *cert. denied*, 474 U.S. 1061 (1986).

The Ninth Circuit applies a "factors" analysis to distinguish single from multiple conspiracies. *Bibbero*, 749 F.2d at 587; *Arbalaez*, 719 F.2d at 1458. As stated in *Arbalaez* at 1458:

> To determine whether the evidence supports the existence of one overall criminal venture, relevant areas of inquiry include "the nature of the scheme, the identity of the participants; the quality, frequency, and

duration of each conspirator's transactions; and the commonality of times and goals." *United States v. Zemek*, 634 F.2d at 1168.

A review of several cases regarding the issue of multiple versus single conspiracies may be helpful in understanding how the courts have analyzed this issue.

In *United States v. Patterson*, 819 F.2d 1495 (9th Cir. 1987), the defendants were charged with conspiracy to distribute heroin. The defendants argued that the conspiracy ended in 1980 when four members were arrested. The Government conceded to this fact. Nevertheless, the Ninth Circuit determined that the evidence showed that other members of the conspiracy "kept it going," with many of the same members running the same illegal transactions after 1980. Addressing the multiple conspiracy issue, the court noted that "a single conspiracy may include subgroups or sub agreements," and that "the evidence need not exclude every hypothesis other than that a single conspiracy exists." *Id.* at 1502. The Ninth Circuit concluded that "the evidence was substantial and that a rational juror could have concluded that there was one overall agreement, explicit or otherwise, to engage in a single conspiracy. *Id*.

In *United States v. Bibbero*, 749 F.2d 581 (9th Cir. 1984), the indictment charged Bibbero and 26 others with conspiracy to import and distribute marihuana from April 1977, to August 1981. The marihuana was brought by ship to designated offshore points, loaded onto smaller boats and taken to shore. Shipments arrived from time to time during the period charged at widely separated locations. The evidence established six major shipments during this time period. The evidence established that Bibbero did not become involved until 1979 and had no connection or involvement with the first four shipments but did act as a supplier for the fifth and sixth shipments. In addressing a claim of multiple conspiracies, the court said ". . . the law is well established that 'one may join a conspiracy already formed and in existence and be bound by all that has gone before in the conspiracy, even if unknown to him.'" *Bibbero*, 749 F.2d at 588 (quoting *United States v. Knight*, 416 F.2d 1181, 1184 (9th Cir. 1969)).

United States' Trial Memorandum - 21

In *United States v. Arbalaez*, 719 F.2d 1453, (9th Cir. 1983), *cert. denied*, 467 U.S. 1255 (1984), Alfonso Beron obtained cocaine from various suppliers and distributed it through a middleman named Shipmen. Four suppliers, Arcila, Garrido, Rojas and Arbalaez were convicted of conspiracy and appealed claiming that the evidence established multiple conspiracies rather than the single conspiracy of which they were convicted. The evidence established that Beron sometimes obtained his cocaine from Arcila and sometimes from Garrido and Rojas and sometimes from Arbalaez. Each knew of the existence and identity of the others but competed with each other on occasion for Beron's business. The court said:

> Each . . . benefitted from the other appellants' participation in the illegal enterprise. The appellants depended on a functioning distribution network that could sell their cocaine whenever they had a supply. To maintain such a network, Beron needed a reliable supply of cocaine. When, for example, Arcila could not supply cocaine, Beron turned to Garrido or Arbalaez. Without several suppliers, Beron would not have had a steady supply of cocaine and his distribution would eventually have dispersed to work with other dealers who had cocaine. The fact that appellants may have competed with each other for Beron's patronage did not make them any less interested in maintaining the overall distribution network.

*Arbalaez* at 1459.

In *United States v. Andrus*, 775 F.2d 825 (7th Cir. 1985) the evidence established that Lutson and Collett traveled extensively over the country to meet Andrus who supplied them with cocaine. Two of Lutson and Collett's dealers were Tom and Bill Whittington in California. Andrus lived in Kentucky. Tom and Bill did not know Andrus and were unaware of other dealers who were supplied by Lutson and Collett. Responding to a claim of multiple conspiracies the court said:

> Andrus provided cocaine to Collett and Lutson, who sold it to Tom and Bill, who intended to distribute it. Andrus knew that he was selling cocaine to Lutson and Collett and that the success of the venture depended on Lutson and Collett being able to sell the cocaine to someone who would distribute it. Tom and Bill knew when they purchased the

United States' Trial Memorandum - 22

P50424dd.JKA

cocaine that Collett and Lutson had obtained the illegal substance from a supplier.  The circumstances of this case present the classic chain conspiracy.  On the one end of the chain, Andrus supplied cocaine to Collett and Lutson who distributed it to Tom and Bill on the other end.

*Andrus*, at 840.  The court went on to say that when "the allegations concern transactions in narcotics, each conspirator must appreciate the existence of others along the distribution chain." *Id*. at 841.

In *United States v. Dickey*, 736 F.2d 571 (10th Cir. 1984), the conspiracy charged alleged possession with intent to distribute and to distribute cocaine and marihuana.  The conspiracy incorporated many members over a period of approximately four years in several states.  It included suppliers, middle men, and distributors.  Defendants again claimed multiple conspiracies rather than a single one to which the court replied that most "narcotics networks involve loosely knit vertically-integrated combinations." (Quoting *United States v. Brewer*, 630 F.2d 795, 799 (10th Cir. 1980).  Even though many separate transactions may be involved, this does not necessarily establish the existence of multiple conspiracies; instead the court must determine whether the activities constituted essential and integral steps toward the realization of a common goal.  *Dickey*, at 582.  Here, the court found the goal to be to possess and distribute narcotic drugs for profit and said that ". . . each major buyer may be presumed to know that he is part of a wide-ranging venture." *Id*.

One of the defendants who participated in only two marihuana transactions argued that there was insufficient evidence to establish membership in a conspiracy to distribute cocaine.  The court responded that he ". . . was involved in transactions involving large amounts of marihuana . . ., his knowledge of a broader venture is readily subject to an inference." *Id*. at 585.

In *United States v. Darby*, 744 F.2d 1508 (11th Cir. 1984), the evidence established ten major smuggling episodes between 1975 and 1982.  The witnesses established that Darby was an active participant in only one of those episodes.  His

P50424dd.JKA

participation was limited to acting as a look out and driving one of the conspirators to the landing strip during this one episode.  In responding to a sufficiency of the evidence argument the court said:

> Darby's participation in the overall conspiracy, however, may be inferred from his involvement in the DC-6 episode.  As this court pointed out in *United States v. Badolato*, 701 F.2d 915 (11th Cir. 1983), "To be found guilty, a defendant need not have knowledge of all the details of the conspiracy, and may play only a minor role in the total operation." *Id*. at 920.  Another court has observed:  "A single act may be 'sufficient for an inference' that an individual is involved in a conspiracy . . .." *United States v. Murray*, 618 F.2d 892, 903 (2d Cir. 1980).

> The court concluded by saying the

> . . . evidence in this case reveals the very hallmarks of a single conspiracy: a regularized pattern of activity involving a significant continuity of membership and directed toward a common goal.

*Darby,* at 1542.

Again, in *United States v. Prieskorn*, 658 F.2d 631 (8th Cir. 1981), a conspiracy count included supplier, middlemen, and distributor.  The evidence established that the middlemen obtained about one pound of cocaine from the supplier approximately once a month from November 1978, until February 1980.  The defendant bought about 10 ounces on one occasion with a partner.  He did not know the supplier, did not know the middlemen prior to this transaction, had not ordered the cocaine in advance and refused to deal with them afterwards.  Answering a sufficiency of the evidence argument the court said:

> The large quantity of cocaine involved here supports an inference or presumption that the appellant knew that he was 'a part of a venture which extend[ed] beyond his individual participation . . . By virtue of this quantity the vertical nature of the conspiracy was known to the suppliers and customers.' quoting *United States v. Magnano*, 543 F.2d 431, 434 (2d Cir. 1976).

*Prieskorn*, at 634-35.

United States' Trial Memorandum - 24

P50424dd.JKA

Finally, in *United States v. Steinberg*, 525 F.2d 1126 (2d Cir. 1975), *cert. denied* 425 U.S. 971 (1976), wherein a supplier advanced the argument that the evidence was insufficient to establish his membership in the conspiracy with distributors the court responded:

> In view of the substantial quantities involved, knowledge of the vertical scope of the operation may reasonably be imputed to the individual coconspirators.  They could hardly have believed that the large amounts of drugs received by Steinberg were not to be resold.

*Steinberg*, at 1133.

## IV.    WITNESSES

### A.    Experts-

The United States previously provided a notice (and an Amended Notice) of expert testimony to the Defendant.

### B.    Law Enforcement-

The United States has provided, in discovery, reports noting each law enforcement witness's participation in this case and has conducted *Henthorn* reviews on all anticipated testifying law enforcement officers.

### C.    Records Custodians-

The United States has previously filed its notice under Fed. R. Evid. 902(11) and 803(6).  *See* ECF 1375, filed April 16, 2015. The United States has provided FRE 902(11) certifications from each business records custodian who prepared records that will be relied upon and/or referenced at trial.

### D.    Cooperating Defendants-

The United States anticipates presenting testimony from one cooperating co-Defendant.  Counsel for the remaining trial Defendant has been provided reports of prior statements, copies of a plea agreement, and copies of his criminal history.

United States' Trial Memorandum - 25

### E.    Cooperating Sources-

The United States anticipates presenting testimony from one non-defendant cooperating informant.  Counsel for the remaining trial Defendant has been provided reports of prior statements, any consideration given to the witnesses for cooperation and copies of criminal history.

## V.    <u>PHYSICAL EVIDENCE</u>

A.    <u>Intercepted and/or Single Party Consent Conversations</u>:

In the recent case of *United States v. Gadson*, --- F.3d ----, 2014 WL 4067203 C.A.9 (Alaska), the Ninth Circuit addressed a number of issues in regard to admission of audio recordings.

> Under Rule 901(a) of the Federal Rules of Evidence, in order "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." In other words, the party offering the evidence must make a prima facie showing of authenticity "so that a reasonable juror could find in favor of authenticity or identification." *Yin*, 935 F.2d at 996 (internal quotation marks omitted). The item may be authenticated by extrinsic evidence, *id*. at 995, such as through testimony of a knowledgeable witness, Fed.R.Evid. 901(b)(1). Thus, *where the government offers an audiotape, a witness with knowledge may testify that the recording is what it purports to be, or is a true and accurate copy of the original*. *See United States v. Panaro*, 266 F.3d 939, 951 (9th Cir.2001); *United States v. Mouton*, 617 F.2d 1379, 1383–84 (9th Cir.1980). Where the government offers a tape recording of the defendant's voice, it must also make a prima facie case that the voice on the tape is in fact the defendant's, whether by means of a witness who recognizes the voice or by other extrinsic evidence. *United States v. Torres*, 908 F.2d 1417, 1425 (9th Cir.1990). Once the offering party meets this burden, "the probative value of the evidence is a matter for the jury." *United States v. Workinger*, 90 F.3d 1409, 1415 (9th Cir.1996). The district court does not abuse its discretion in admitting evidence that meets the minimum requirements for authentication. Id. at 1416.

*Gadson*, --- F.3d ----, 2014 WL 4067203 at Headnotes [12], [13], [14], [15] (emphasis added).

In *Gadson*, the recordings at issue were recorded prison telephone calls. *Id.* at Headnote [16]. The Ninth Circuit explained that the officer witness authenticating the recordings "was familiar with the prison telephone system and gave detailed testimony regarding how the system recorded all calls, how the jail call log could be searched based on date, phone bank, and telephone number, and how he had run such searches many times [and] [h]e testified that he reviewed more than 100 hours of prison phone calls relating to Gadson and Wilson." *Id.* The Ninth Circuit continued, "[a]lthough [the officer] did not testify that the calls introduced at trial were accurate copies of the prison recordings, neither defendant challenged the recordings on this basis. [The officer's] testimony was 'sufficient to support a finding that the item is what the proponent claims it is,' Fed.R.Evid. 901(a), and the district court did not err in failing to raise this issue sua sponte. *Id.* In this case, the recordings at issue come from both Title III interceptions and recorded jail calls.

The Ninth Circuit also addressed voice identification, explaining that

the district court abuse its discretion in concluding that the government had carried its burden of making a prima facie case that the voices on the tapes were those of Gadson and Wilson. [The officer] testified as to the methodology he had used to identify the speakers. He first listened to recordings of all phone calls made from the cell wing in the prison where the defendants were held during the applicable time period and scanned those calls for context clues suggesting the identity of the speaker. [The officer] identified Gadson's voice on the recording based on several factors: he had met Gadson and was familiar with his "very unique" voice, he determined that almost all of Gadson's calls were to Gabriella Haynes, and in at least one conversation, [the officer] heard Gadson talking about a list of items which had been seized from his house during the search, information accessible to only a handful of people at that time.

[The officer] identified Wilson's voice in the recording based on other extrinsic evidence. First, [the officer] heard the voice of a different

1
2
3
4
5

prisoner calling Gabriella Haynes shortly after Wilson was admitted. Because the other defendants had previously been detained, [the officer] reasonably inferred that this new voice belonged to Wilson, the last member of the drug operation to be arrested. Second, during the time Wilson was in the segregation unit, he had to make written requests to use the telephone, and the timing of Wilson's requests corresponded with the new voice's calls to Gabriella Haynes. Finally, the caller discussed facts particular to Wilson's case.

6
7
8
9
10
11

[The officer] sufficiently narrowed the universe of possible callers so as to support an inference that the speakers in these calls were Gadson and Wilson. *Cf. Yin*, 935 F.2d at 996; *Torres*, 908 F.2d at 1425. Because the district court's admission of this testimony was not "illogical, implausible, or without support in inferences that may be drawn from facts in the record," *Hinkson*, 585 F.3d at 1251, it did not abuse its discretion in admitting it.

12    *Id.* at Headnote [16].

13    In this case, the United States anticipates that voice identification will be made

14    by witnesses that have been a party to the recording; cooperating witnesses that are

15    familiar with the parties' voices; and law enforcement witnesses that identified and

16    became familiar with the parties' voices during the investigation.

17
18    B.    Transcripts:

19    "It is well established in [the Ninth Circuit] that the admission of typewritten

20    transcripts 'as an aid in listening to tape recordings ... is a matter committed to the

21    sound discretion of the trial court.'" *United States v. Plunk*, 153 F.3d 1011, 1026 (9th

22    Cir. 1998) (quoting *United States v. Turner*, 528 F.2d 143, 167-68 (9th Cir. 1975)[2]),

23    _____

24    [2] *See Turner*, 528 F.2d at 167-68. {"It is well recognized that accurate typewritten

25    transcripts of sound recordings, used contemporaneously with the introduction of the

26    recordings into evidence, are admissible to assist the jury in following the recordings

27    while they are being played. *People v. Feld*, 305 N.Y. 322, 331—332, 113 N.E.2d 440

28    (1953). *See United States v. Murrapese*, 486 F.2d 918, 921 (2d Cir. 1973); *United*

P50424dd.JKA

*opinion amended on denial of reh'g by United States v. Plunk*, 161 F.3d 1195 (9th Cir. 1998). In this case, while the wiretap recordings are in English, the conversations are replete with coded terms, jargon and truncated words. As such, the United States submits that the transcripts will aid the jury in listening to the wiretap interceptions.

C.   Photographs and Documents

The United States intends to admit photographs and documents pursuant to Fed. R. Evid. 901(a).

D.   Charts:

The United States will proffer charts to aid the fact-finder and to organize the presentation of evidence contained in the United States' opening statement and in its case-in-chief. The United States offers such charts alternatively – both illustrative/demonstrative exhibits, and then reserves on the final issue of whether these charts would go to the jury as evidence under FRE 1006. The United States will

---

*States v. Bryant*, 480 F.2d 785, 790—791 (2d Cir. 1973); *United States v. Koska*, 443 F.2d 1167, 1169 (2d Cir. 1971), *cert. denied*, 404 U.S. 852, 92 S.Ct. 92, 30 L.Ed.2d 92 (1971); *Fountain v. United States*, 384 F.2d 624, 632 (5th Cir. 1967), *cert. denied*, 390 U.S. 1005, 88 S.Ct. 1246, 20 L.Ed.2d 105 (1968); *United States v. Hall*, 342 F.2d 849, 853 (4th Cir. 1965), *cert. denied*, 382 U.S. 812, 86 S.Ct. 28, 15 L.Ed.2d 60 (1965). *Cf. Lindsey v. United States*, 332 F.2d 688, 691—692 (9th Cir. 1964); *Chavira Gonzales v. United States*, 314 F.2d 750, 752 (9th Cir. 1963). The admission of such transcripts as an aid in listening to tape recordings, like the use of photographs, drawings, maps, and mechanical models which assist understanding, *Feld, supra*, 305 N.Y. at 331—332, 113 N.E.2d 440, is a matter committed to the sound discretion of the trial court. *Koska, supra*, 443 F.2d at 1169; *Fountain, supra*, 384 F.2d at 632; *Hall, supra*, 342 F.2d at 853.").

address that question at the close of the case and after consultation with the Defendant and this court.

The law differentiates between illustrative "pedagogical" exhibits used during opening and during trial testimony to illustrate/organize a parties' evidence, and charts/summaries which are actually *admitted* into evidence and which go to the jury. *United States v. Wood*, 943 F.2d 1048, 1053 (9th Cir. 1991); *see also United States v. Baker*, 10 F.3d 1374 (9th Cir. 1993).

If actually going to the jury as evidence, "[T]he proponent of a summary must demonstrate the admissibility of the underlying writings or records summarized, as a condition precedent to introduction of the summary into evidence under [Federal Rule of Evidence] 1006."  *United States v. Anekwu*, 695 F.3d 967, 981 C.A.9 (Cal.), 2012 (quoting *United States v. Johnson*, 594 F.2d 1253, 1257 (9th Cir.1979)).  In *Anekwu*, the Ninth Circuit explained:

> "Charts and summaries as evidence are governed by Federal Rule of Evidence 1006...." *United States v. Wood*, 943 F.2d 1048, 1053 (9th Cir.1991). "In contrast, charts or summaries of testimony or documents already admitted into evidence are merely pedagogical devices, and are not evidence themselves." *Id*. However, we have not "articulat[ed] a bright-line rule against admission of summary charts as evidence." *United States v. Boulware*, 470 F.3d 931, 936 (9th Cir.2006), *vacated and remanded on other grounds, Boulware v. United States*, 552 U.S. 421, 128 S.Ct. 1168, 170 L.Ed.2d 34 (2008). Although "we do not approve of receiving summary exhibits of material already in evidence," we have not "reverse[d] for that reason." *Id*. We have also "elsewhere recognized a district court's discretion under [Federal Rule of Evidence] 611(a) to admit summary exhibits for the purpose of assisting the jury in evaluating voluminous evidence." *Id*.

695 F.3d at 981-82

In this case, the charts (specifically, four charts) have been prepared to aid the jury in understanding the voluminous evidence in this wiretap investigation and to aid the jury regarding the overall investigation.  The charts are based upon telephone records, subscriber records, T-III calls, surveillance, controlled buys, etc.  The United States has provided the Defendant with copies of these charts in advance of trial.  The United States believes in good faith (and by seeing no objections anticipated on the

United States' Trial Memorandum - 30

parties' mutual Exhibit List), that information contained on such charts is competent for trial, helpful to the fact-finder, and that the United States may elect to refer to one or more of these charts in opening statement to orient the jury to the United States' theory of the case, and to define the evidence that will be presented by the United States in its case-in-chief.

Dated: April 24, 2015.

MICHAEL C. ORSMBY
United States Attorney

*s/ Jared C. Kimball*
Jared C. Kimball
Assistant United States Attorney

United States' Trial Memorandum - 31

P50424dd.JKA

# CERTIFICATE OF SERVICE

I hereby certify that on April 24, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Mr. Douglas D. Phelps
Ms. Katharine Allison
Phelps & Associates, PS
2903 N. Stout Road
Spokane, Washington 99206-4373


*s/ Jared C. Kimball*
Jared C. Kimball
Assistant United States Attorney

United States' Trial Memorandum - 32
P50424dd.JKA